Next case up is 412-098-2, Englum v. Board of Trustees of Police Pension Fund of the City of Charleston. For the appellant, Mr. Charles Edwill, you are Mr. Edwill? Yes. For the appellee, is Christopher Wetzel? Is that pronounced correctly? Yes, correct. Thank you. Mr. Edwill, you may proceed. Thank you. Please record. My colleague, Mr. Wetzel. Counsel. Your honors, I will just provide a very brief procedural history in this particular matter and the action in the board and the circuit court. The plaintiff in this matter was hired as a police officer for the City of Charleston in 2005. He was injured while on duty on December 7, 2008, when he slipped in the employee's parking lot, injured his hand and his shoulder. Prior to that occurrence, he was on a dispatch on December 7, 2008, where he was dispatched by CECOM, which handles the dispatch for that county, to Casey's General Store. CECOM initiated the dispatch. The application by the plaintiff was filed on January 22, 2010, for a line of duty under 114.1 of the pension code and alternative non-duty 114.2 of the pension code. The hearing was commenced on March 2011 and again on July 1 of 2011. The board denied the request for the line of duty disability and granted the plaintiff a non-duty disability, considering that he was disabled. The circuit court reversed the board's decision under the clearly erroneous doctrine. We would accept for the sake of argument today that the standard probably is a clearly erroneous doctrine. However, I would state also that the facts in this case are the focal point. Once the facts are determined, the capacity issue dealing with the application of the statute I think will be readily clear. Legislation in this matter, the statute that applies, number one, the line of duty disability under the pension code 114.1 and non-duty is 114.2. Under 114.1, the statute provides that if there is a disability resulting from the performance of an active duty, not merely that happening on duty, but an active duty, then that will establish the line of duty disability. We look to the Chicago Code, which is Article 5, under 113, which defines the term active duty. Now that term has been engrafted onto the line of duty provision under the Article 3 pension code. That provides that it's an active police duty inherently involving special risk, not one ordinarily assumed by citizens in the ordinary walks of life. We look to how that definition has been interpreted by our courts. We look to the Johnson case, which is the premier case that the Supreme Court decided. Counsel, let me kind of cut to the chase here. What happened in front of the board? Why do you think the board did what they did? It all comes down to the issue of capacity. What was his capacity of operation of service at the time of the injury? The board determined that at the time of the injury, the SECON dispatch had cleared. There was no emergency, nothing else pending, that his patrol duties had been suspended at that point of time and the injury occurred as not under the application of the active duty statute. But also, wasn't there contrary evidence that Sergeant Peterson reassigned an officer to follow up with the dispatch so that there was evidence that the call hadn't been cleared? Well, I think the SECON testimony and the referral to the CAD ticket clearly shows that it had been cleared. And the understanding by the board is that this was merely a shop for a cop or shop with a cop, which is a request by the chief to pick up supplies for disadvantaged children. Now, the board's not arguing at the point that the dispatch, if he's on patrol, would qualify. The question is, did the dispatch cease? Did his patrol duties end when he entered the station at that point of time when he was injured? And we believe under the cases that have been adopted, and the Jones case, of course, is a primary case within this jurisdiction, but that case also reconciled its decision with approval with the Fedorsky case of the 2nd District and also with the Filsgrove case of the 1st District. Both of those cases were injuries that occurred while on duty, but were not considered acts of duty. You referenced just now, and then also in your brief, this shop with a cop program, and you indicated in the brief that the dispatch was for an officer to go pick up supplies. Yes, sir. Is that in the record? We believe that it is in the record. There was understanding of that that's what it was. But if you further look at the CAD ticket and the testimony from the SECON… Just pause me right there. I'm not sure I understand. Was that what the officer was told? Was Edgum told to pick up stuff or shop for tots or whatever it was? I would preface that by saying that it is believed that that's what it is. However… We don't know what the dispatch said? I don't think that's ever been actually referenced in the record. No, sir. He testified to what he heard. Was there any contrary testimony to his on what he heard? Contrary testimony by both SECON representatives when they reviewed the ticket. There was no emergency noted. There was nothing… Was there any contrary testimony as to what the dispatch said? As to what the state of the dispatch was? Yeah, what he was told, why he was told, or what he was told when he was told to… I don't think that there's ever been any statement in the record indicating exactly what it was with the exception of the applicant's, the plaintiff's, testimony. Well, then, counsel, at page 26 of your brief, how do you explain your statement? Quote, Moreover, the record herein is clear that the nature of the call to Casey's was merely a request by the chief to pick up supplies for shop with a cop. I believe that that was discussed, Your Honor, before the board when they had questions on the nature of the dispatch. So, Englund testified he's just told to go to Casey's, and he didn't know what it was about. That's what he said, yes. And the dispatcher, anyone else who actually was involved with that, didn't testify differently, did they? Well, the dispatch, the question came down to, actually, what was the nature of the dispatch and the procedure involved? And that CECOM basically indicated if there was an emergency or any communication by the applicant, or the plaintiff, that is, or from the chief, that that would be noted on the ticket. The plaintiff testified that he tried to reestablish communication with CECOM. He requested that CECOM notify the chief. CECOM refutes that, saying that that was not so stated, and it is not on the ticket. Anything that was stated to CECOM would be noted on that ticket, and they reviewed that ticket and said that that was not there. Go ahead. Okay. The only evidence that really supports the plaintiff's testimony is the handwritten statement that was produced as Exhibit 6, Exhibit 19, which being the original. And the plaintiff repeatedly testified before the Board that that was prepared on December 7th, on the day of the accident, within one to two hours after the accident occurred. He didn't state that once. He stated it repeatedly. The first time that that statement appeared, actually, before the Board, even though a request for production was filed a year before, that statement first appeared at the time of the hearing. Nobody ever saw it before that time. So the Board members had a question. If he prepared that on December 7th, why did it say on that statement that he was taken to Sarah Bush Hospital by Sergeant Peterson, which did not occur until December 8th? And, in fact, he refused medical treatment on December 7th. So the Board provided no credibility to that statement, as far as the handwritten statement, and basically felt it was a fabrication, that it was not prepared on December 7th. It was probably prepared in anticipation of a hearing in this matter. Was there anything contained in that statement that wasn't merely corroborative of oral testimony? The matter where he states that he urgently returned to the station, that he was concerned about the criminal activity in the area, et cetera, that is stated in that statement. That is the only documentation that really states that. But did he also testify to that? He did testify to that, absolutely. So it's corroborative? It's corroborative, yes. But the Board gave it no credit from the standpoint they felt it was a fabrication, based upon his testimony. Also, as far as his attempt to re-communicate with CECOM, CECOM refuted that. So the Board believed that there was some question as far as his testimony, the veracity of his testimony from that standpoint, too. Where did Judge Schick go wrong in this case? He basically reweighed the evidence. He threw the decision of the Board out as clearly erroneous, made a statement in the decision indicating that the Board found no capacity in which the plaintiff was operating. When the Board did find capacity, they said that the capacity did not rise to the level of an act of duty as required by the statute. The Court also failed to review the whole record as required in the Marconi Supreme Court decision in support of the Board's decision. The Court provided no deference to the Board's finding of facts. The law is very clear under Iwinski that the statement of facts, the findings of the Board, are considered prima facie true and correct. So we believe in also stating that... Didn't Judge Schick state that? Pardon me? Didn't Judge Schick state that? Well, with all due respect, Your Honor, if it was stated, it's a belief that he did not consider that. He understood what the standard of review was. Well, I'm not suggesting that he didn't. Finally on this, I think if we look at the case law applied, if you look at Fedorsky at the Second District Court, which was approved in the Jones case, in that situation, Mr. Fedorsky was a passenger in a vehicle, squad car. He was on duty. They were at a light and he was rear-ended by a drunk driver. He was injured, was found not on duty, and the Court sustained that. If you look at the Filsgrove case, also a First District case, there's a police officer who entered the rear seat of the squad car in the parking lot. The driver of that vehicle put it in gear and ran over his foot, disabled, but not on duty disability. The Morgan case, injury when the police officer is making out a report, falls out of his chair basically, injures his back, not on duty. So in this particular case, if the Court finds that Mr. England's patrol duties had been suspended at the point of time that he entered the parking lot and exited his vehicle, then there's no other conclusion in this particular matter, but that is a non-on-duty disability as opposed to a line-of-duty disability because he was not operating in the capacity as required under 114.1. I think we have to be very clear that when we look at the statute and the interpretation of the statute, the legislature clearly intended that not all injuries which occur while on duty are entitled to a line-of-duty disability. If that were not the case and we could just take the statute and basically throw it out, say that everything that happens while on duty, not a question about it, you're entitled to a line-of-duty disability. But that's not what the case law says in this particular matter. From that standpoint, Your Honors, we are asking that this Court respectfully sustain the decision of the Board and reverse the decision of the trial court. Okay. Thank you, Counsel. Thank you. Mr. Wetzel? May it please the Court? Counsel? I want to address a few things first that Mr. Atwell brought up and some of the questions that Your Honors have raised as well. He talks about the Fedorsky case. That's distinguishable here. You have to speak up a little bit. I'm sorry. The Fedorsky case, that's distinguishable here. The Fedorsky case dealt with the evidence technician. He wasn't a patrolman. I would point out this Court's definition of what a patrolman's duties are. In the Jones decision, it says, The job of a patrol officer is general duty police work in the protection of life and property and the enforcement of laws and ordinances. The work involves preventive patrol, preliminary investigation, traffic enforcement, regulations and preservation of social order and public peace by means of patrolling in cars or on foot in the designated area where the officer is accountable. In other words, the officer's duties in Fedorsky is drastically different than a patrolman. And it's the capacity, like Mr. Atwell states, it's the capacity that's controlling here. We know that in the Johnson decision. But what capacity was Mr. England operating under? And I think, Justice Steinman, that's what your primary focus was in questions to Mr. Atwell. Well, today was the first day I've ever heard the Board say what its finding was with regards to capacity. Judge Schick noticed that. Well, what capacity was he acting in? He was a patrolman. And the patrolman's duty that time was to patrol the east side of Charleston. He was dispatched by the dispatch center by the city of Charleston. To investigate what? We don't know. And they talk about that they knew it was shot for a cop. I would like, Your Honors, to review the CAD report. I have it open in front of me. I brought it with me today. This is what it says. 12-7-2008 at 12-44-39. It says no employees know what he's talking about. Spoke to managers, et cetera. Employees not sure what they are talking about. That's what he says. So he has no idea what's going on at that point in time. That's what the CAD report says. That's all we know about the CAD report. If you look at the... What does the record show concerning the dispatch of him to cases? Well, the two dispatch officers, I would note that we called all the witnesses. We found the dispatch officers and brought them in to testify. Initially, on the first hearing, why there's a gap, Justice Steigman, the gap is because they didn't even believe there was a CAD report to be found. They thought we were making this all up to begin with. Then they found the CAD report, and all of a sudden we got a new story. Yeah, the chief of police sent him there. Now we've got to figure out why this is not an act of duty. And they said, well, the call was over. It said it was terminated. If you read the testimony of the dispatchers, it wasn't unequivocal as it says in the reply brief. Unequivocally says this is... What does he say? He basically goes around the bush and with leading questions, he basically says, and you read it. I'm not going to quote it because I don't have it in front of me. But, yeah, it would look like that it was completed at the time. But he doesn't recall the actual call. He doesn't remember any of this stuff because it's happened two or three years before that. We did an investigation just to find that Adam Burzell and this lady was on duty that time so we can try to get this report. Sergeant Peterson testified that he tried to get the report, but he couldn't find it. After the hearing in March, they sent a special detective, Officer Blagg, to conduct an investigation, who then assigned another officer, another detective in the department, to run an investigation as to whether this CAD report existed. And they found it. Well, at that point in time, I said, well, that's great. Now, all of a sudden, we know there's a dispatch call. In the story, it should be concluded. Well, it wasn't. They say at that point in time, his officer's duties ended whenever he came back to the police station. That just doesn't make any sense. Let me ask you this. There was evidence before the board that the dispatch was cleared. You acknowledge there was that evidence? Yes. Okay. You say that there's contrary evidence, but let's just take the case most favorable here for the party that prevailed before the board, and that is the dispatch had been cleared. Do you agree that if the dispatch had cleared the call, then the injury that was suffered by the officer afterwards would not have been an act of duty, or do you dispute that? I would dispute that. Okay. And why? And the basis for that is the Rose decision. If your honors would look at Rose, and they always have these detention cases with wrong names. I'm sorry. Rose v. Board of Trustees of the Mount Prospect Police Detention Center. That case is a First District case, but at that time, an officer was dispatched to the gas station. Very similar to this situation. But he was looking for a missing juvenile. When he arrived there, the CAD report indicated that he said, no Jews here. He coded, cleared the call, and closed. Pulled out of the gas station and then was hit in an automobile accident. The Rose court said that's still compensable. Just because he coded and cleared the call doesn't mean it relieves his duties of a patrolman. And I've heard the arguments in the briefs, circuit court level, and here today that this doomsday theory that if Officer England's actions was considered an act of duty, then every act of duty that a patrolman would make would be considered on-duty disability benefits. That's just not true. You know, a patrolman has more responsibilities out there, but we still look at capacity. So one of the questions when I was preparing for this was to say, well, my question would be, well, tell me an instance where a patrolman wouldn't be considered on-duty and considered on-duty disability benefits. What I came up with, or what I would argue that that would happen, was let's say Officer England, 1230, was eating lunch at a local restaurant. He sits down to eat lunch. He then gets up and walks across. He slips on the floor. Suffers injury. The modality is the same in the fact that he was walking across some section of ground, but the capacity was different because he was in the process of getting lunch, which didn't cause any significant risk to anyone. No additional significant risk that would affect the general public, whatever the language of that particular case law states. But he wasn't in any increased risk that a general public person wouldn't have been in. But, at the same time, let's suppose that the door, a citizen, all of a sudden waves him outside and says, I need some help here. And then he goes across and exits the building but falls down in the process. Well, that capacity, but he's going to the aid of a general public, and therefore it's part of his duties and his capacity was fulfilled. He was acting under the duty. So those are the two differences, and I would agree that that distinction was a difficult one for me to grasp when looking at it. The Johnson case, I think, sets it out as clearly as possible with the officer walking across the street and slipping in a pothole or hit in a pothole and he gets injured. And the court says, well, the modality of him crossing the street didn't put him at any greater risk, but the fact that the citizen waved him across and asked for assistance, him doing that, his capacity was won and his title to on-duty disability benefits. Let me ask you this question. Sure. This officer cleared the call and went back to the station to inquire of the chief saying, why was I called out? What is the difference between him exiting the car under those circumstances and at the end of his shift he parks in the same place, gets out of his car and slips and falls at the end of the shift? Well, because I still think that it's the capacity of an officer trying to figure out what is going on with that call. He may have cleared it and said, hey, we don't have anything to worry about at Casey's right now, but I'm still going to investigate to see why I was going to be out there. Common sense would dictate that if a boss of mine would tell me, hey, go down to 4th and Jackson and see exactly, interview a witness down there, and I go down there and say they don't know what I'm talking about, and I just sit on my hands and do nothing, and then trial comes or something comes up and says, hey, did you interview that witness? Well, no, they said I didn't know what I was talking about. I don't think that's going to pass muster. I don't think anybody's going to sit here and say, well, you did a good job there or that is exactly what we expect out of a patrolman. If we come there, we're not going to ask any further questions. We're just going to say it's all done and over with, no more patrol duties and we're going to go home. You know, what if there was, as Officer England stated in there, that he had many different things racing in his mind. Did they pull a crank call? They only had two officers on duty at the time. Did they pull a crank call, diverting all the attention over to Casey's General Store as if something else was happening somewhere else in town? So he was thinking about that. He couldn't get a hold of Sergeant Peterson, at least through his testimony. That can be argued whether that's true or not, but he said he couldn't get a hold of him because the cell service in Charleston Police Department is poor. They're at the bottom of the building, in a brick building, and they sometimes can't get cell service. So there was a lot of things running through his mind at the time, is what he's testifying to. And when he got out of the car, he came around the back of it and slipped on some ice. The modality is the same, granted. Anybody walking around a car or slipped on ice can fall down and hurt themselves, granted. But the capacity in which he was acting, still investigating the dispatch call, inquiring about the dispatch call, we know Sergeant Peterson stated that in his testimony, that he personally took the statement from Officer Englund as to what happened, took him off the call after noticing he was injured, and reassigned Officer Blevins, who was patrolling the west side of Charleston at that time, to follow up on the report. There's nothing in the CAD report about it, but they didn't even think the CAD report existed. So now they want to base their whole case on this CAD report and two dispatch officers that didn't even know were there until we found them. The dispatchers were like, this was three years ago, I'm not for sure exactly what happened with this call, so they talk in generalities about, hey, look at this, review this. Would that say it was clear? Well, yeah, it probably would be clear. You know, something like, well, did you remember this call? No, he doesn't remember the call. They don't remember specifics. But he did testify that this was a CAD report and those kind of things. So in the end, I believe that the capacity here is controlled by Johnson. There is no question. They misconstrued what capacity is. And sure, the patrolman's duties are larger. They encompass more. They're out there more. They don't know what's going to happen. They could have something happen spur of the moment, just like this court found in the definition I read earlier. The same definition, well, a little broader definition in the Charleston police ordinances or job description of what a patrolman's duties are. So the shop with a cop, that's another. He didn't know it was shop with a cop. He had no idea it was shop with a cop. They didn't know it was shop with a cop until my client testified that two or three days later, he found out that it was dealing with shop with a cop. That's when he found out about it. He was upset about it. Other officers were upset about it, that an officer got injured because he was running out to shop for a cop, and they didn't tell him what was going on. And in fact, one of the board members, and I forget which one, is the one that brought it up. Shop with a cop, yeah, that is a program that we have and explained it. So they didn't know that it was going on. He didn't know it was going on at the time. And I don't even know if it really matters, but it's not an issue here. The standard review is clearly erroneous standard. I would note there's some dissent on that, but based on my review of this case and looking at the reply brief and some of the things that were stated in there, I can see why it's clearly erroneous. I can see why there's a mixed question of law or fact, even though the undisputed facts here, that he was on duty at the time, as in he was working as a Charleston police officer at the time, and most of those other facts that Mr. Atwell has stated, they don't really disagree with it. But there is a mixed question of law and fact because of the way that they're interpreting those facts into the law. So I can understand why the 4th District has went with the clearly erroneous standard, and in large part I would tend to agree with it. But I would point out there is some split in authority in the 1st District saying that there is no question of fact at all. If there's no disagreement, then it's a de novo review because it only deals with law. Does your honors have any additional questions? I don't think so. Okay. Thank you, counsel. Thank you. Mr. Atwell? Thank you. Just a few brief comments. One of the cases that was cited was the Rose decision, and in that decision it's noted that the plaintiff was still on patrol even though his investigation had ceased. He was still driving the vehicle on patrol. Let me ask you about that, Mr. Atwell. Let's assume for the moment that the officer was dispatched to Casey's and he arrived and it turns out the reason he was dispatched is some people in Casey's started a fight and the fight ensued. Someone was knocked down and the perpetrator fled and the officer gets there and he looks into the situation. The injured party is taken off by EMTs. The situation is now secured. Apparently it had nothing to do with Casey's other than it happened to be the location where these two people got in a fight. And he now returns to the station. Everything else happens just the same. Was he on duty? Oh, he's on duty. So the injury upon his return that he suffered at the parking lot is incapacity as an officer for purposes of being on duty? I'm not quite sure if I understand, but I acknowledge he's on duty, and there's no question on December 7th he is on duty. Is he acting incapacity as an officer for purposes of the issue before us here? I'm not quite sure if I understand your scenario, Your Honor. Is he injured at Casey's in your scenario? No, I said he goes to Casey's, checks into the report, determines that a criminal offense occurred there, a battery occurred there, someone was injured, and after 20, 45 minutes he leaves. Everything else is just the same. So in other words, there's no question of criminal activity at Casey's, but he leaves. No, criminal activity occurred at Casey's. Okay, and is the call cleared? Apparently. The call is cleared. There's no further input from him, and he returns to the station? Yes. His patrol duties had ceased at that time. So his patrol duties always cease when? They have to at some point of time. I mean, according to Sergeant Peterson, he has 48 hours, anybody does, to file a report. Otherwise, we'd be suggesting that if he goes home, he's still got 48 hours. Is he still on duty? Is he still in the performance of an active duty if there's an injury that happens at that point of time? So the critical injury, as they said, is the capacity in which he was acting at the time he was injured. Any officer returning to the police station is no longer acting in the capacity for purposes of this pension matter. He's no longer at any kind of special risk or acting as a police officer? No, not once. If there's no further continuation of the investigation and the activity. Well, how about he comes back to the station to make up his report? Does that count? If it's cleared? No, I would say it does not. What do you mean if it's cleared? What does that term mean? If the call is cleared and there's an indication that he has no further services to perform with the exception of making a report, my argument would be no, he is not on patrol service at the time it's suspended. And I think under the Morgan case where he was filing a criminal report and injured at the department, it did not qualify as an active duty. Give me an example of the hypothetical I gave you where he would not be cleared. Well, let's say that the call was not cleared and let's say he had to make further investigation and there was some urgency, some concern. He was going back to the department because the call had not been cleared. There could be an argument made at that point of time that the patrol duties had not ceased and he was still involved in the furtherance of the investigation. He wanted to know what the chief was talking about. I'm sorry? He wanted to know what the chief was talking about. Why did you send me there? But he says he contacted CECOM to reestablish communication. CECOM says that was never done. CECOM says anything by anybody that was said would be noted on that ticket. They said that wasn't done. Okay. He didn't say anything over the radio. He left Casey's. He says, I don't know why I was here. Goes back to the police station because the original call came from the chief. He wanted to know, what are you talking about? Well, it's a belief that that was not the case, Your Honor. It's a belief also that when he entered that parking lot, everything had ceased at that point of time and he was merely injured like any employee in the employee parking lot that slipped and fell. So he came back to the police station, going back to my hypothetical, and he was going to call the hospital, see what's happened with the person who was taken, or make other calls to find out about the person who supposedly had fled. That would still be on duty in that regard? Not cleared, I guess, is your term? It's not cleared yet? I wish I could reconcile all these cases. I can't. But my feeling is, no, there is a point of demarcation there. And when he is in the employee's parking lot going into the department, he can file his report within 48 hours on any incident. But at that point of time, he's not driving his vehicle. He's not on patrol. He's merely an employee in that lot. There was nothing further at that point of time that required any emergency. At that point of time, it ceased. His patrol duties were suspended. My belief is, otherwise, everything that is occurring on duty is going to be considered a line of duty injury. And that is not what the statute says, not what the case law interpretation is. Thank you, counsel. Thank you. I'd advise him to be in recess.